**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Luke Adams, | No. CV-18-00378-TUC-JGZ (LAB) |
| Plaintiff, | **ORDER** |
| v. | |
| Symetra Life Insurance Company, et al., | |
| Respondents. | |

Pending before the Court is Magistrate Judge Leslie A. Bowman's Report and Recommendation (R&R) that the Court deny Defendant Symetra Life Insurance Company's Motion for Partial Summary Judgment on Bad Faith and Punitive Damages Claims. (Doc. 257.) Symetra filed an Objection to the R&R and Plaintiff Robert Luke Adams filed a Response. (Docs. 260, 265.) For the following reasons, the Court will adopt Magistrate Judge Bowman's Report and Recommendation and deny Defendant's Motion.

## I.    Standard of Review

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis in original). District courts are not required to conduct

1    "any review at all . . . of any issue that is not the subject of an objection."  *Thomas v. Arn*,

2    474 U.S. 140, 149 (1985).  *See also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

3    **II.    Discussion**

4         **A.    Background**[1]

5         Adams, who worked as a self-employed insurance agent, purchased a long-term

6    disability policy from Defendant Symetra. Under the Policy, disability is defined as

7    sickness or injury that prevents the insured from "performing with reasonable continuity

8    the material and substantial duties of [his] regular occupation" resulting in "a 1% or greater

9    loss of income." (Doc. 257, p. 2 (quoting Doc. 203, ¶ 13).)  For disability caused or

10   contributed to by certain special conditions, including musculoskeletal disorders of the

11   neck and back, the policy only paid a monthly payment for a maximum of 12 months in

12   the participant's lifetime.  A person's regular occupation is defined in the policy as "the

13   occupation as it is performed nationally."  (*Id.* (quoting Doc. 203, ¶ 15).)

14        On January 22, 2018, Adams submitted a claim under the policy stating that he was

15   no longer able to work as an insurance agency owner due to rheumatoid arthritis (RA).

16   Adams also submitted a Physician's Statement from his treating rheumatologist, Dr. Ulker

17   Tok.  Dr. Tok listed three diagnoses:  Rheumatoid Arthritis, Low Back Pain, and Chronic

18   Pain.  When Adams submitted the claim, he was 38 years of age and making over $500,000

19   per year.  If Adams was deemed disabled under the policy, he would be entitled to $160,000

20   per year for 27 years, or approximately four million dollars.

21        Adams's claim was initially assigned to claims manager Stephanie Cortez.  Cortez

22   approved the claim provisionally after obtaining medical records from Dr. Tok and

23   Adams's pain management specialist, Dr. Coury.  She accepted the claim based upon

24   Adams's low back pain, chronic pain, and rheumatoid arthritis.  As the claim could be

25   subject to the 12-month limitation for special conditions, Cortez marked the claim for

26   monitoring to determine whether Adams would remain disabled beyond 12-months in a

27   non-limited condition.

28

---

[1] The parties do not contest the factual background set forth in the Magistrate Judge's R&R.  The Court restates the facts necessary to address Symetra's objection.

Adams's claim was subsequently transferred to claims adjuster Peter Skipp. Skipp performed internet research, conducted a background search, obtained records from Drs. Tok and Coury, ordered three rounds of surveillance on Adams, referred the claim for occupational analysis, and referred the claim to two non-examining consultants: Dr. Vikram Garg, a rheumatologist, and Dr. Frank Polanco, an occupational medicine physician.

Dr. Garg, who reviewed Adams's medical records, surveillance reports, and spoke with Dr. Tok, concluded that while Adams had seronegative rheumatoid arthritis, he had no restrictions or limitations. Dr. Garg explained that his assessment of functional limitation was based on the fact that there was "no evidence of persistent small joint synovitis or restriction in peripheral joint range motion." (Doc. 257, p. 5 (quoting Doc. 203, ¶¶ 75, 80).) Dr. Garg stated in his report that the surveillance videos showed inconsistencies in Adams's condition and his activities.

Dr. Polanco was instructed to review any non-rheumatological diagnoses and limitations. He reviewed the medical documentation and wrote a report opining that while Adams experienced chronic pain and periodic flare-ups from his RA, he had no limitations from non-rheumatological diagnoses, and was able to work full-time.

Skipp subsequently concluded that Adams was not disabled and never had been. His determination was approved by the department manager. Skipp sent Adams a lengthy letter dated November 7, 2018, explaining Symetra's final decision. (Doc. 234-2, pp. 59-63.) The letter stated in part: "In order to address any restrictions and limitations that would be medically supported from a rheumatological perspective, an independent board-certified rheumatologist [Dr. Garg] was consulted. Based on the information in the file, the reviewing rheumatologist opined there were no supported restrictions and limitations preventing you from performing sustained activities of any level." (Doc. 257, p. 5 (quoting Doc. 234-2, p. 62).)[2] The letter further explained:

---

[2] The denial letter acknowledged Dr. Coury's recommended functional limitations and opinion that Adams was "incapable of working full time," but explained that Dr. Garg rejected Dr. Coury's conclusion. (Doc. 234-2, pp. 60, 62.)

> Additionally, independent observation of your activities shows you engaging in a level of functioning that is inconsistent with what you have reported. The movement observed by surveillance is contrary to your reported restrictions and limitations and is consistent with an ability to perform light work.
>
> Therefore, while you do appear to have diagnoses of rheumatoid arthritis and degenerative disc disease and associated low back pain, given the information currently available, we have determined that those conditions do not impair you from performing the material duties of your Regular Occupation as an insurance agent.

(Doc. 257, pp. 5-6 (quoting Doc. 234-2, p. 63).)

Thereafter Adams filed the instant action alleging Symetra breached the insurance contract and breached the duty of good faith and fair dealing by failing to pay benefits due in accordance with Adams's long-term disability income insurance policy.   (Doc. 1.) Symetra now seeks partial summary judgment on Adams's bad faith and punitive damages claims.   (Doc. 202.)

Magistrate Judge Bowman recommended that the Court deny the motion.   (Doc. 257.)   Symetra objects to the recommendation and seeks de novo review.   (Doc. 260.)

**B.     Bad Faith**

To prevail on a bad faith claim, Adams must establish that Symetra (1) acted unreasonably toward Adams and (2) acted knowing that it was acting unreasonably or acted with such reckless disregard that such knowledge may be imputed to it.  *Miel v. State Farm Mut. Auto Ins. Co*., 185 Ariz. 104, 110 (App. 1995).   Under the first prong of the test, in considering whether the insurer's conduct was reasonable, courts consider whether the claim itself was "fairly debatable."  *Milhone v. Allstate Ins. Co.*, 289 F. Supp.2d 1089, 1094 (D. Ariz. 2003).   The second prong of the test is a subjective test.  *Trus Joist Corp. v. Safeco Ins*. Co,. 153 Ariz. 95, 104 (App. 1986).   To meet this prong, the plaintiff must prove either "the insurer's knowledge that it is acting improperly"  or the insurer's "reckless conduct which permits such knowledge to be imputed to it."  *Id*.

1    Symetra argues that it is entitled to summary judgment on Adams's bad faith claims

2   because no reasonable jury could conclude Symetra acted unreasonably.  (Doc. 202, p. 11.)

3   Symetra asserts that it had a reasonable basis to conclude that Adams was not disabled

4   because it collected Adams's medical records; had the records reviewed by a registered

5   nurse and two physicians; and one of the physicians spoke with Adams's treating

6   physician, who agreed that what impaired Adams was his longstanding, underlying

7   degenerative spine condition.[3]  (*Id*.)  For the following reasons, the Court agrees with the

8   Magistrate Judge that, viewing the evidence and all reasonable inferences in Adams's

9   favor, Adams provided sufficient evidence from which a reasonable juror could conclude

10   that Symetra acted in bad faith.

11    A juror could find that Symetra acted unreasonably toward Adams because Adams's

12   claim was fairly debatable or because Symetra knew or recklessly disregarded evidence of

13   the validity of Adams's claim.  Adams points to numerous problems with Symetra's

14   reliance on the doctors' opinions, the surveillance, Adams's medical records, and the

15   vocational analysis.  For example, in its denial letter, Symetra wrote: "neither independent

16   consulting physician disputed the diagnoses . . . but they determined based on the totality

17   of the information in the claim file that there were no supported restrictions and limitations

18   relating to those conditions."  (Doc. 203-19, p. 22.)  But at deposition, Skipp admitted that

19   Dr. Polanco's comments supported Adams's claim and provided evidence that Adams's

20   RA was "still an active condition that is causing the flare-ups," which was "evidence that

21   it may be a condition that impairs" and was "continuing to impact his functionality."  (Doc.

22   265, p. 3 (citing Doc. 230-1, SSOF ¶ 45; Doc. 234-1, pp. 88-89).)  Further, Dr. Polanco

23   noted that while "[t]here are no restrictions supported for [Adams's] non-rheumatological

24   diagnoses," "[t]he findings in the medical records reflect that [Adams] is primarily limited

25   by his condition of [RA] and chronic pain," specifically, "chronic pain and flare ups

26   secondary to his [RA]."  (Doc. 265, at 4 (citing Doc. 203-19, pp. 8-9; Doc. 230-1, CSOF ¶

27

28

---

[3] Although Symetra argues in this instance that the doctors concluded Adams was disabled by virtue of his degenerative spine condition (a condition which would not be subject to further coverage), Symetra argues at other times that Adams was not disabled at all.

1    88, SSOF ¶ 44).)

2          Similarly, evidence supports Adams's assertion that Symetra ignored or misstated

3    statements by Adams's treating physician which supported Adams's reported limitations.

4    In its denial letter, Symetra stated that Dr. Tok found Adams was "'capable of performing

5    a low stress job with symptoms . . . .'" (Doc. 257, p. 8 (quoting Doc. 234-2, p. 60)), but

6    Dr. Tok's full statement included the conclusion that she was "'not sure" if Adams can

7    perform his "high stress job as a financial planner/consultant."[4] (*Id.*)  At deposition, Skipp

8    acknowledged knowing that Dr. Tok believed that Adams was disabled partially due to

9    stress, but this information does not appear to have been considered, and was not included

10   in the letter denying Adams's claim.  (Doc. 257, pp. 8-9 (citing Doc. 234-1, p. 65).)

11         In addition, it appears that Symetra mischaracterized Dr. Tok's September 2018

12   statements to Dr. Garg.  According to Dr. Garg's report,  Dr. Tok told Dr. Garg that Adams

13   had chronic pain and back pain and "'it is somewhat difficult for her to distinguish exactly

14   what is causing limitations but feels that it is more of his issues related to his back.'"  (Doc.

15   265, p. 6 (quoting Doc. 203, ¶ 73).)  In its denial letter, Symetra wrote that Dr. Tok told

16   Dr. Garg that Adams's "restrictions and limitations are contributed to by [his] lower back

17   condition," which, Symetra concluded, would subject his claim to the Special Conditions

18   limitation.  (Doc. 203-19, pp. 22-23).)  At deposition, Skipp admitted that Dr. Tok was not

19   certain  which  condition,  his  back  condition  or  RA,  was  primarily  causing  the  pain

20   specifically in Adams's *back* and that Dr. Tok's uncertainty related only to the primary

21   cause of his back pain.  (Doc. 265, pp. 6-7 (citing Doc. 230-1, CSOF ¶ 73, SSOF ¶¶ 4-6,

22   15, 17-18, 21, 25-28, 30, 45-47, 52).)  Skipp also knew that Dr. Tok continued to hold the

23   opinion that Adams's RA rendered him disabled.  (*Id.* at p. 7 (citing 230-1, SSOF ¶¶ 18,

24   26).)  Moreover, Skipp knew about Adams's continued reports that pain from "'RA was

25   worse than back,'" and that Adams experienced flares in multiple areas including his "feet,

26   hands and knees, etc.  [Adams] described it as full body."  (*Id.*)  Despite this knowledge,

27   ───────────────
         [4] Adams was not a financial planner/consultant.  Adams was the owner of an
28   insurance company and he maintained that his work was stressful.  (Doc. 257, p. 8. (citing
     Doc. 230-1, SSOF ¶¶ 2, 3).)

Symetra suggested in its letter that Dr. Tok's opinion supported a finding that Adams's reported limitations stemmed from his back condition.

In its letter, Symetra also referred to inconsistencies in Adam's medical records concerning Adams's functional limitations.[5]  Yet, Symetra lacks evidence to support a conclusion that Adams's medical records contained inconsistencies.  Symetra does not identify any inconsistencies noted by the clinician.  (*See* Doc. 203, ¶ 47.)  Moreover, Skipp conceded at deposition that Adams's "'medical records support reports of serious rheumatoid arthritis pain,' that they 'indicate that the flare-ups were causing problems in places other than his back,' and that '[w]hen he was experiencing a flare, he had tremendous pain.'"  (Doc. 265, p. 7 (citing Doc. 230-1, SSOF ¶¶ 26, 28).)  Skipp further testified that the fact that Adams was continuing to have multiple flare-ups of his RA in multiple joints, five to six times per week, was evidence that Adams had an "'extremely impairing' condition."  (Doc. 265, p. 7 (quoting Doc. 230-1, SSOF ¶ 30).)

Symetra relied on the surveillance to deny coverage yet admits that the surveillance did not show any inconsistencies with Adams's reported limitations.[6]  There were multiple rounds of surveillance, and Skipp testified that after six days of surveillance there was "'nothing inconsistent with what Mr. Adams's reported he could do on a good day, and a third of the time . . . he was not observed outside his residence.'"  (Doc. 265, p. 5 (quoting Doc. 230-1, SSOF ¶¶ 37, 40).)  Dr. Polanco did not see any inconsistencies in the surveillance either.  (Doc. 257, p. 10 (citing Doc. 234-1, p. 102).) Dr. Garg, the only person who claimed the surveillance revealed inconsistencies,[7] could not identify a specific

---

[5]  Symetra stated: "Due to the inconsistencies regarding your functional capacity reflected in the medical records, the clinician was unable to determine whether impairment was supported."  (Doc. 203-19, p. 18).)

[6]  In its Objection, Symetra states that "it did not say that surveillance was the reason that Symetra found Dr. Garg's and Dr. Polanco's opinions more persuasive than Dr. Tok's and Dr. Coury's opinions."  (Doc. 260, p. 5.)  Whether surveillance was or was not the specific reason why Symetra accepted a particular doctor's opinion, a reasonable juror could conclude that Symetra unreasonably relied on surveillance as a basis for denying Adams's claim based on Symetra's denial letter which states: "'[t]he movement observed by surveillance is contrary to your reported restrictions and limitations and is consistent with an ability to perform light work.'"  (Doc. 257, p. 10 (quoting 234-2, p. 63).)

[7]  Dr. Garg did not review the full surveillance footage.  Instead, he reviewed some

1    inconsistency and was "not sure" why he stated otherwise.  (Doc. 265, p. 5 (citing Doc.

2    230-1, SSOF ¶¶ 49, 51).)  Dr. Garg testified that he would "'have to go back and review

3    everything.'"  (Doc. 257, p. 10 (quoting Doc. 234-2, p. 111).)  No one from Symetra

4    contacted Dr. Garg to clarify why he made the statement that surveillance showed

5    inconsistencies.  (*Id.*)

6           The record shows questions of fact about the reasonableness of Symetra's reliance

7    on Dr. Garg's opinion.  In his report, Dr. Garg acknowledged that Adams was properly

8    diagnosed with RA and that Adams reported experiencing pain throughout his body (feet,

9    hands, shoulders, wrists, knees and ankles) "on and off with flares of rheumatoid arthritis."

10   (Doc. 230-1, SSOF ¶¶ 46, 47.)  Even though Dr. Garg knew that RA can cause pain

11   throughout the body and stress can exacerbate RA (*id.*), he did not comment in his report

12   on Adams's RA flare-ups, ability to handle stress, or the effect of the flare-ups on Adams's

13   ability to perform job duties.  (Doc. 230-1, CSOF ¶ 75, SSOF ¶ 50.)  Nor was Dr. Garg's

14   opinion reasonably informed by an awareness of Adams's job duties.  When Dr. Garg was

15   asked at deposition whether he had considered Adams's required job activities in analyzing

16   whether Adams's RA was causing pain that would prevent him from performing his job,

17   he initially responded that he relies on objective data because "[p]ain is very subjective, so

18   we don't look at that solely."  (Doc. 230-1, SSOF ¶ 48.)  He later acknowledged that he

19   was not provided with "[t]he specific physical and day-to-day" job activities.  (*Id.*) Instead,

20   Dr. Garg determined that Adams was not disabled from performing the duties of his

21   occupation based on the generic classification of "sedentary to light level occupation."

22   (*Id.*)  In sum, it could be argued that Symetra accepted Dr. Garg's opinion even though Dr.

23   Garg did not factor in Adams's specific job duties, stress, or RA flare-ups.[8]

24   still photos.  (Doc. 230-1, SSOF ¶ 49.)

25        [8] In its objection, Symetra challenges what it characterizes as the magistrate judge's
26   "suggest[ion] that an insurance company must always adopt the opinions of a treating
     physician over an independent consultant or there will be a fact issue."  (Doc. 260, p. 4.)
27   In this case, Skipp acknowledged that an examining physician would ordinarily have
     greater insight into a person's condition than a physician who reviews only documents and
28   he knew that Drs. Tok and Coury had examined Adams many times.  (Doc. 257, p. 4 (citing
     Doc. 230-1, SSOF ¶ 29).)  Similarly, Dr. Garg also agreed that Adams's treating physician
     would be in a better position than himself to assess the degree of legitimate pain Adams's

1    Questions of fact also exist as to whether Symetra's vocational analysis reasonably

2    supports its determination.  Skipp knew that Adams's ability to perform his job duties was

3    at issue under the policy and that Symetra had to determine that Adams "'could go back to

4    being an owner of an insurance agency, that had low stress, in order for him to be able to

5    return' at all."  (Doc. 265, p. 8 (quoting Doc. 230-1, SSOF ¶¶ 54-55).)  Adams points out

6    that Skipp performed no investigation as to Adams's specific job duties or whether his

7    occupation was causing him stress.  (*Id.* at p. 8.)  Skipp did not put the question to any of

8    the claim reviewers, and they did not comment on it. (*Id.*)   Moreover, Symetra's

9    occupational analysis reviewer, who determined that Adams's occupation requires light

10   exertion and occasional travel, was not provided a job description for Adams's occupation

11   and did not know that he ran a business, including managing several employees.  (*Id.* (citing

12   Doc. 230-1, SSOF ¶ 56).).

13   Because a reasonable juror, viewing this evidence in the light most favorable to

14   Adams, could find that Symetra knowingly ignored or recklessly disregarded evidence that

15   Adams was disabled and entitled to benefits under the policy, or knowingly engaged in an

16   outcome-driven analysis, to deny Adams's disability claim, the Court will deny Symetra's

17   motion for summary judgment on Adam's bad faith claim.

18   **C.    Punitive Damages**

19   "Punitive damages may not be awarded in a bad faith tort case unless the evidence

20   reflects 'something more' than the conduct necessary to establish the tort."  *Rawlings v.*

21   *Apodaca*, 151 Ariz. 149, 161 (1986) (citation omitted).  To establish "something more"

22   than bad faith in support of a punitive damages claim, the plaintiff "must prove that

23   defendant's evil hand was guided by an evil mind. The evil mind which will justify the

24   imposition of punitive damages may be manifested in either of two ways. It may be found

25   where defendant intended to injure the plaintiff.  It may also be found where, although not

26   intending to cause injury, defendant consciously pursued a course of conduct knowing that

27   experienced.  (Doc. 265, p. 8 (citing Doc. 230-1, SSOF ¶ 47).)  Although there is no per se
     rule that a treating physician's opinion always carries greater weight, here, a reasonable
28   juror could conclude that the consulting doctors' opinions and other record evidence did
     not reasonably support Symetra's rejection of the treating doctors' opinions.

it created a substantial risk of significant harm to others." *Rawlings*, 151 Ariz. at 162. (internal quotation marks and citations omitted). In a bad faith insurance action, the showing of an evil mind must be by clear and convincing evidence. *Demetrulias v. Wal-Mart Stores Inc.*, 917 F.Supp.2d 993, 1010-1011 (D. Ariz. 2013). "[T]he court considers the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred, . . . [t]he duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment of it." *Id.* at 1011. Importantly, "[b]ecause a defendant rarely admits to an 'evil mind,' improper motive is often inferred from sufficiently oppressive, outrageous, or intolerable conduct." *Id.* (citing *Thompson v. Better-Bilt Aluminum Prods. Co., Inc.*, 171 Ariz. 150, 162–63 (1992); *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 498 (1987)).

Symetra asserts summary judgment is proper because Adams "will be hard-pressed to find any claim activity that amounts to bad faith, let alone clear and convincing evidence of the 'something more' necessary for punitive damages." (Doc. 202, p. 13.) In rejecting Symetra's argument, the Magistrate Judge determined that a reasonable juror could conclude that there is clear and convincing evidence that Symetra "'consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to [its insured].'" (Doc. 257, p. 12 (quoting *Rawlings*, 151 Ariz. at 162).) Viewing the evidence and inferences in the light most favorable to Adams, the Court agrees.

Based on the evidence set forth in Section II.B, *supra*, a reasonable juror could conclude, by clear and convincing evidence, punitive damages are warranted where, among other actions, Symetra intentionally failed to consider key aspects of Adams's condition, misstated the opinions of Adams's treating doctor, relied upon an evaluating doctor who did not consider Adams's job requirements, and falsely represented that surveillance and the medical records supported its denial of the claim at substantial risk of harm to Adams. *See Demetrulias,* 917 F.Supp.2d at 1011 (denying insurer's motion for summary judgment on punitive damages where plaintiff relied on same evidence that supported bad faith claim because the court could not say that no reasonable juror would also find the conduct

outrageous or intolerable).  Even if a jury did not conclude that Symetra' actions were knowingly false, a reasonable jury could conclude that Symetra "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to [Adams]." *Rawlings,* 151 Ariz. at 162.  Either showing is appropriate to defeat summary judgment.[9]

**III.   Conclusion**

For the foregoing reasons, IT IS ORDERED that:

1.   The Report and Recommendation (Doc. 257) is ACCEPTED and ADOPTED.  Defendant's Objection (Doc. 260) is OVERRULED.

2.   Defendant's Motion for Partial Summary Judgment on Bad Faith and Punitive Damages Claims (Doc. 202) is DENIED.

Dated this 3rd day of November, 2020.

Honorable Jennifer G. Zipps
United States District Judge

---

[9] The Court rejects Symetra's reliance on ERISA cases, none of which involve a punitive damages analysis.